**Federal Defenders**
OF NEW YORK, INC.

Eastern District
One Pierrepont Plaza, 16th Fl., Brooklyn, NY 11201
Tel: (718) 330-1200  Fax: (718) 855-0760

Barry D. Leiwant
*Interim Executive Director
and Attorney-in-Chief*

*Eastern District of New York*
Michelle A. Gelernt
*Interim Attorney-in-Charge*

November 29, 2023

BY ECF

The Hon. Frederic Block
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:   *United States v. Jeremy Monk*, No. 22-cr-442 (FB)

Dear Judge Block:

Jeremy Monk is a man who is deeply committed to his family and his community. He has spent his entire adult life working hard for little money to support the people he loves. When the COVID-19 pandemic hit, Mr. Monk took a job that many people would run from. He began working in a correctional setting for the Bureau of Prisons at a time when close contact with large groups of people could have been a death sentence. During the course of his employment, Mr. Monk made the worst mistake of his life. He accepted money to bring contraband to incarcerated people. Having acknowledged his mistakes, Mr. Monk has spent every day since his arrest proving to his family and the Court that he deserves a second chance.

Section 3553(a) requires a sentence that is "sufficient, but not greater than necessary" to satisfy the goals of just punishment, deterrence and rehabilitation. For the reasons detailed below, a downward variance is warranted in Mr. Monk's case and we ask the Court to consider a non-incarceratory sentence. A non-Guidelines sentence is appropriate because Mr. Monk is a first-time offender who has shown significant rehabilitation in the 16 months since arrest. He has maintained full-time employment at a job he excels at, provides financially and emotionally for his 14-year-old son, and has perfectly complied with the rigors of pre-trial release. Mr. Monk requests that the Court permit him to continue his progress under the close supervision of the Probation Department.

Attached to this submission are 17 letters of support from Mr. Monk's family members, friends, and colleagues. *See* Exhibit A, Letters of Support (Alexander Medina, Nephew; Aquille Brown, Coworker; Asia Moore, Coworker; Donte Brown Friend; J.M., Son; Jerrell Richards, Friend; Keona Crosbie, Fiancé; Lejon Beckford, Coworker; Mattie Dickerson, Son's Grandmother; Odessa Medina-Soto, Cousin; Rachelle Turenne, Coworker; Regina Wyatt, Son's

Mother; Shay Canady, Coworker; Steven Holder, Coworker; Sylvia Alcala, Mother; Taisha Crosbie, Fiancé's Mother; Willie Andrews, Friend).

I. **The Sentencing Guidelines**

The PSR and addendum calculates Mr. Monk's total offense level at 17, and finds, with a criminal history category of I, that Mr. Monk's Guidelines range is 24-30 months. Mr. Monk objects to the calculation of his total offense level and contends that the appropriate Guidelines range is 12-18 months, with a total offense level of 13. However, either range is higher than is required for a sentence that satisfies the purposes of 18 U.S.C. §3553(a)(2). This is particularly true in light of the recent amendments to the Guidelines which call on courts to consider non-incarceratory sentences for non-violent offenders with no criminal records, like Mr. Monk.

   a. **Mr. Monk was not a Public Official in a Sensitive Position and Objects to an Enhancement under U.S.S.G. § 2C1.1(b)(3)**

Probation assesses Mr. Monk a four-point enhancement under U.S.S.G. § 2C1.1(b)(3), finding that Mr. Monk held a "sensitive position" based on his employment as a correctional officer at the Metropolitan Detention Center.[1] In this case, Probation construes "sensitive position" too broadly. This enhancement only applies when the offense involves "an elected public official or any public official in a high-level decision-making or sensitive position." U.S.S.G. § 2C1.1(b)(3). A correctional officer for the Bureau of Prisons is a public official but is neither elected nor "in a high-level decision-making or sensitive position." High-level decision-making or sensitive positions are characterized by "direct authority to make decisions for, or on behalf of, a government department, agency, or other government entity, or by a substantial influence over the decision-making process." U.S.S.G. § 2C1.1, App. Note 4(A). Correctional officers are employees of the Bureau of Prisons, obligated to *enforce* its rules and regulations, not to make or influence decisions of their own. The application to correctional officers is too broad an expansion of this enhancement.

"Examples of a public official who holds a sensitive position include a juror, a law enforcement officer, an election official, and any other similarly situated individual." U.S.S.G. § 2C1.1, App. Note 4(B). Correctional officers are not similarly situated to these examples. They are more like security guards than law enforcement officers. Certainly, they enforce rules and discipline prisoners, but their arrest powers and right to carry firearms are vastly more circumscribed than those of law enforcement officers. Their positions are neither characterized by a direct authority to make decisions for the Bureau of Prisons nor by substantial influence over any decision-making process. While they can write up an incarcerated person, this is a miniscule authority. Suggesting that correctional officers have "direct authority to make decisions for a government agency" is akin suggesting that the chef at a courthouse café has such "direct authority for a government agency" because he can make specialty dishes, or that a

---

[1] Mr. Monk pled guilty to a plea agreement which included this enhancement. Notably, he did not stipulate to the enhancement in his plea agreement. The defense made the government aware of this objection during plea negotiations and it was understood that this enhancement would be litigated at sentencing.

2

postman has such "direct authority for a government agency" because he can decide what house to deliver mail to first.

At least one district court has found that a corrections officer was not in a high-level decision-making or sensitive position. *See United States v. Henderson*, 465 F. Supp. 3d 778, 778-80 (N.D. Ohio 2020) (declining to apply the enhancement for a state corrections officer). This court should join the *Henderson* court in distinguishing the limited power of a corrections officer from highly sensitive law enforcement positions. Admittedly, several Circuits have decided similar cases against our position. *See United States v. Grosso*, 658 F. App'x 43 (3d Cir. 2016); *United States v. Dodd*, 770 F.3d 306 (4th Cir. 2014); *United States v. Guzman*, 383 F. App'x 493 (5th Cir. 2010); *United States v. Griffith*, 781 F. App'x 418 (6th Cir. 2019); *United States v. Zamora*, 982 F.3d 1080 (7th Cir. 2020). However, these cases vary in the standards they apply to arrive at such a finding. Notably, the Second Circuit has not opined on this issue, and in the absence of a clear standard, the Court should decline to apply the enhancement. This argument is identical to what the government argued in *United States v. Clarence Brooks* when they asked this Court to decline to apply such an enhancement in a factually similar case. *See Brooks,* 20-cr-071(FB), ECF No. 242, Gov't Sentencing Memorandum, at 2, fn. 1.

### b. The Recent Guidelines Amendments Favor a Non-Incarceratory Sentence for a Non-Violent, First-Time Offender Like Mr. Monk

On November 1, 2023, Congress adopted the Sentencing Commission's pending Guidelines Amendments which both lowered Mr. Monk's Guidelines calculation and specifically recognized the availability of non-incarceratory sentences for defendants similarly situated to Mr. Monk.

Pursuant to the recent amendments, Mr. Monk received an additional two-point decrease to his base offense level for being a "zero point offender." *See* U.S.S.G. §4C1.1.[2] "Zero point offenders" include individuals who, like Mr. Monk, have no prior convictions. *Id*. This change was informed by recidivism data that demonstrated that those defendants with no criminal history points have a "considerably lower recidivism rate[] than other offenders."[3]

Moreover, the Guidelines, as amended, explicitly state that "a departure, *including a departure to a sentence other than a sentence of imprisonment*, may be appropriate if the defendant received an adjustment under §4C1.1 (adjustment for certain zero point offenders) and the defendant's applicable guideline range overstates the gravity of the offense because the offense of conviction is not a crime of violence or an otherwise serious offense." *See* U.S.S.G. §5C1.1, App. Note 10(B). Here, Mr. Monk is a "zero point offender" whose crime, while serious, did not involve any violence, nor did it involve bribes for weapons or other more serious

---

[2] A complete copy of the 2023 Amendments can be found at https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202305_RF.pdf.
[3] United States Sentencing Commission Memorandum, May 1,2023, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/retroactivity-analyses/2023-criminal-history-amendment/202305-Crim-Hist-Amdt-Retro.pdf

contraband. It is reasonable to infer that Mr. Monk is precisely the type of defendant whom the Sentencing Commission was envisioning when they promulgated clear language explicitly allowing a departure to a non-incarceratory sentence for a "zero point offender."

## II. The 3553(a) Factors Weigh in Favor of a Non-Incarceratory Sentence

The Supreme Court has repeatedly affirmed a federal judge's ability to grant a variance from the Guideline range based on the § 3553(a) factors. *See, e.g.*, *Beckles v. United States*, 137 S. Ct. 886, 892 (2017). The Court has also made clear that granting a variance does not require a showing of extraordinary or special circumstances. To the contrary, "courts are entitled to vary from the . . . guidelines in a mine-run case where there are no 'particular circumstances' that would otherwise justify a variance from the Guidelines' sentencing range." *Spears v. United States*, 555 U.S. 261, 267 (2009). Mr. Monk's work history, lack of criminal record, dedication to his family, and perfect record of pre-trial release weigh in favor of a non-incarceratory sentence.

### a. Fatherhood and Family

The single most important thing in Jeremy Monk's life is his 14-year-old son J.M. Having to watch the trauma and impact this case has had on J.M. has served as far worse punishment than any jail sentence could ever impose.

Jeremy Monk and Regina Wyatt were only teenagers when they got pregnant and had J.M. Mr. Monk and Ms. Wyatt continued to date briefly after J.M. was born, but soon realized that their romantic relationship was not sustainable. Even at a young age, they were both entirely committed to co-parenting their son - and for the past 14 years, they have done so successfully. Early on in J.M.'s life, Mr. Monk worked multiple minimum wage security jobs so that Ms. Wyatt could stay home and care for J.M. When he wasn't working, he spent every moment he had with his son. Ms.Wyatt writes "From the beginning Jeremy has been there and didn't skip a day with J.M. He even helped with one of my friend's son[s] whose father was in and out of prison. Jeremy has been a positive role model for our son and his friends, showing up to school events for them, taking them on trips to the zoo, circus, park, movies, you name it. He is by far a really great father, which is amazing because neither he nor I had that, but he gave it to our son." *See* Exhibit A, 13.

As Ms. Wyatt highlights in her letter, Mr. Monk grew up without his father, which is, in part, why he has worked so hard to build a strong relationship with J.M. He was raised by a single mom and lived below the poverty line for most of his life. PSR ¶ 35. While he didn't have much in the way of financial resources as a kid, Mr. Monk credits his mother, Sylvia, with providing a loving and supportive home for him and his sister. To this day, Mr. Monk is extremely close with both of them and supports his family in whatever ways he can.

Mr. Monk made perhaps one of the most selfless choices a parent can make when he and J.M.'s mom mutually agreed to move J.M. to Oklahoma in 2021 for the school year so that he could have access to better schools and a healthier environment. Now, J.M. lives with his mother and grandmother in Oklahoma during the school year but visits Mr. Monk for school breaks and

during the summer months. Prior to this case, Mr. Monk traveled to Oklahoma regularly. No matter where J.M. is, Mr. Monk speaks to his son daily.

When Mr. Monk was arrested in August 2022, Federal Agents burst into his home, guns drawn, as is their regular practice when executing an arrest warrant. At the time, Mr. Monk was home with J.M. Both Mr. Monk and J.M. were deeply frightened and had no idea what was happening. They were both ordered to get on the ground and put their hands behind their heads. Mr. Monk saw the fear in his son's eyes as they were both placed in handcuffs. That moment is one he will never forget. The fact that his actions led to such a traumatic experience for his son still brings Mr. Monk to tears thinking about it.

The arrest that took place in this case was just the start of a very hard experience for Mr. Monk's son. In the months following Mr. Monk's arrest, J.M. dropped out of playing competitive sports and his teachers noticed a decline in his concentration at school. He frequently expressed fear and concern that his dad was going to jail and that he wouldn't get to see him or talk to him. As he wrote in his letter of support, "My father and I have a very tight knit relationship, I go to him about and for everything he's my best friend. I honestly wouldn't know what I'd do if he were no longer around to reach out to whenever I needed him." *See* Exhibit B, 5.

Mr. Monk has continued to prioritize J.M. throughout his criminal case. When J.M. was struggling in school, they would use zoom to do his homework together. Mr. Monk has assured J.M. that, no matter what his sentence, he will always be in his life. Mr. Monk has also used this case to demonstrate an important life lesson to his son – that when you make bad choices, you must accept responsibility for them.

Mr. Monk serves as a role model for many young men in his family. As his nephew Alexander Medina writes, "He played a father figure role in my life unknowingly still till this day and is one of the only fathers in our family who actually takes care of his son." *See* Exhibit A, 1. He writes further, "Jeremy inspires me to have a child one day and try to be as good of a father as he is. His absence would be a burden for everyone especially his son and close family, we all rely of him for peace and emotional stability and his son relies on him for everything." *Id*.

The Second Circuit has affirmed downward departures where a Guidelines sentence would impose extraordinary hardship upon the defendant's family, e.g., *United States v. Galante*, 111 F.3d 1029, 1036 (2d Cir. 1997), *United States v. Johnson*, 964 F.2d 124, 129 (2d Cir. 1992) such as where imprisonment of a defendant "might well result in the destruction of an otherwise strong family unit," *United States v. Alba*, 933 F.2d 1117, 1122 (2d Cir. 1991). These downward departures are granted out of the concern that an adult's sentence should not leave children abandoned—either financially or emotionally. The Second Circuit has explained that "we are reluctant to wreak extraordinary destruction on dependents who rely solely on the defendant." *Johnson*, 964 F.2d at 129. While Mr. Monk's son is not solely his responsibility, he provides critical financial and emotional support for his him. As Probation wrote after a conversation with Ms. Wyatt, the mother of Mr. Monk's son, "For the sake of their son, who is struggling with the prospect of the defendant being sentenced to a term of incarceration (she confirmed the child's

grades have slipped and he has lost interest in extracurricular activities), Ms. Wyatt is hopeful that the defendant will be given a second chance to atone the mistake he made." PSR ¶ 38.

### b. A Hard Working Man

Mr. Monk has always worked hard, for little pay, to support his family. With only a high school equivalency diploma, his options have been limited. For much of his life, Mr. Monk worked as a security guard, making minimum wage with various employers. During baseball season, he worked at Yankee Stadium. At other times, he worked at concert venues and bars such as the Beacon Theater. He has also worked for New York City Department of Homeless Services as a "special officer." As a security guard, he was constantly picking up extra shifts to earn overtime and working holidays and weekends, all just to make ends meet.

In May of 2020, only two months after the COVID-19 pandemic hit New York City, Mr. Monk was offered a job by the Bureau of Prisons. This was a stable job with guaranteed pay, even if still minimal (it promised an annual salary of $56,000). It required Mr. Monk to be in a congregate setting for 12-hour shifts at a time when everyone was being told to stay as far away from each other as possible. Nevertheless, Mr. Monk took the opportunity for stability and a steady income. Unfortunately, that also led to him making some of the worst decisions of his life. While working as a correctional officer, Mr. Monk accepted money to bring contraband into the MDC. He makes no excuses for what he did and he deeply regrets his actions.

Since leaving the MDC, Mr. Monk has made the choice to work in a healthier environment for himself, doing the work he loves – helping others. Since July 2022, Mr. Monk has been employed full-time as a behavioral health associate for New York City Health and Hospitals. He works in a facility with mentally and physically disabled people, working alongside medical staff to provide healthcare and treatment to those who need it the most. Mr. Monk has finally found a job that offers financial stability and mental fulfillment.

One of the things Mr. Monk enjoys most about his job is being amongst coworkers that share his values. He is clearly respected by his workers, as is demonstrated from his many letters of support from them. As one coworker, Aquille Brown, writes, "He is always willing to go above and beyond in making sure both patients and staff members are taken care of. I would also like to add that he is a calming presence on the unit that helps to maintain the therapeutic milieu. Working with him has made me into a better worker." *See* Exhibit A, 2. Another coworker, Asia Moore, writes, "Jeremy has also demonstrated a genuine passion for working in the Mental Health field as a Behavioral Health Associate. He consistently strives for self-improvement, actively seeking opportunities to expand his knowledge and skills. His dedication and enthusiasm are truly inspiring. Based on my interactions and observations Jeremy always comes to work on time, he is a hard worker, he loves helping people, he is family oriented & his ability to put on a cheerful face even during difficult times is what I appreciate about him." *See* Exhibit A, 3. An incarceratory sentence would result in Mr. Monk losing the best job he has ever had. Worse, it would mean he could no longer provide financially for his son.

### c. Community Support

Mr. Monk currently lives with his fiancé, Keona Crosbie in Brooklyn. Should the Court allow him to remain in the community he has every intention of continuing with his work as a behavioral health associate with NYC Health and Hospitals. As the Court can see from the many, many letters of support, Mr. Monk has a strong reputation in his community for being a supportive, honest, and kind person. He is clearly surrounded by people that love and respect him and will be there for him, reminding him to stay on the right path.

> *In my time of homelessness he was the only person I could count on to be there whether it was the shirt off of his back or house sitting my dog for months for no charge he is and always has been someone I can count on.*
> -Shay Canady, Coworker/Friend, Exhibit A, 14.

> *Jeremy has recently started his career as a Behavioral Health Associate to help people in his community. Jeremy expressed that his life experiences, victories and recent setbacks all provide him with the necessary skills to help people in his community regardless of the fact that he is currently experiencing adversity in his own life. I am proud of how my son was able to shine a light and make positive change in the lives of people in his community while he is in the midst of one of the darkest and most embarrassing times of his adult life.*
> -Sylvia Alcala, Mother, Exhibit A, 16-17.

> *I'm telling you about a man who occasionally takes his old pairs of jeans and sneakers to give to the men's shelter he worked at between 2017-2020, and randomly buys 20 McDonalds burgers to hand out to the homeless who wonders the streets.*
> -Keona Crosbie, Fiancée, Exhibit A, 7.

> *Jeremy is a man of great integrity and has always shown respect amongst his peers. In all of my interactions with Jeremy I've found him to be a honorable person who exudes positive energy and it is clear that he is striving to be better each and every day.*
> Aquille Brown, Coworker, Exhibit A, 12.

> *Jeremy's kindness and compassion have been instrumental in helping me through various challenging situations. Whether it was offering a listening ear, providing invaluable advice, or simply be there as a dependable friend, he has consistently shown the utmost integrity and reliability. Jeremy's unwavering support has made a significant difference in my life, and I am immensely grateful for his presence.*
> Donte Brown, Friend, Exhibit A, 4.

> *I am currently a Maryland State Trooper, and when I was home sick or came back to New York to visit, Jeremy made it his priority to see me and just give me some type of comfort so I could complete the training. Jeremy is a big reason as to where I am in my life.*
> Jerrell Richards, Friend, Exhibit A, 6.

### d. Success on Pretrial Release

For the past year Mr. Monk has been subject to the supervision of pre-trial release which has put his situation into perspective. Mr. Monk's conditions of pre-trial release do not allow him to leave New York unless he is given special permission, which is particularly distressing because his son lives out of state. Mr. Monk has taken extra care to ensure he is complying with his conditions because he understands that he must show the Court that he will follow all rules imposed on him. He knows that he needs to show the Court how seriously he is taking this case and the consequences that come with it. And in doing such, the Court can see that Mr. Monk has been perfect – he has not violated a single condition of release since his arrest.

### III. Conclusion

Mr. Monk has no criminal history, is employed full-time, and is a loving father, partner, and friend. The shame and stress of this case has offered all the deterrence Mr. Monk needs to know in his soul that he will never veer down such a harmful path again. He has spent his time on pre-trial release showing this Court and his family that he is ready, willing and able to redeem himself. A non-incarceratory sentence followed by a period of supervision in this case can accomplish the goals of sentencing while allowing Mr. Monk to continue supporting his family in the community.

Respectfully Submitted,

*Kathryn Wozencroft*
Kathryn Wozencroft
Assistant Federal Defender
(347) 802-7800

cc: AUSA Philip Pilmar (via ECF)
U.S. Probation Officer Gregory Giblin (via email)